Louis J. GINOCHIO, Plaintiff,

v.

SURGIKOS, INC, et al., Defendants.

No. C–93–2587–CAL.

United States District Court,
N.D. California.

Aug. 22, 1994.

Joseph Anthony Ferrante, A.J. Fusco, Jr., Passaic, NJ, for plaintiff.

Susan Market Sharko, Shanley & Fisher, Morristown, NJ, Thomas W. Pulliam, Jr., Preuss Walker & Shanagher, San Francisco, CA, for defendants.

### OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

LEGGE, District Judge.

■ In 1987 plaintiff was fitted with two artificial knee implants called Microloc Total Knee Systems, manufactured by defendant

Johnson & Johnson Orthopedics, Inc[1]. The implants subsequently failed.

### I.

In this action, plaintiff alleges the following claims: 1) defendants were negligent in the manufacture, testing, labeling, inspection, processing and sale of the products; 2) defendants failed to provide adequate warnings; 3) defendants failed to properly design and manufacture the products; 4) defendants were generally negligent; and 5) the products did not meet express warranties or the implied warranty of fitness and merchantability. Plaintiff brings these claims under general principles of state tort law. However, in the pending motion plaintiff also argues that defendants failed to comply with federal statutes and regulations.

### II.

Defendants move for summary judgment on the ground that plaintiff's state law claims are preempted by the Medical Device Amendments (MDA) to the Food, Drug, and Cosmetic Act. Defendants also argue that plaintiff has no standing to bring claims for enforcement of the federal statutes or regulations. Plaintiff opposes the motion.

The court has reviewed the moving and opposing papers, the record of the case, the arguments of counsel, and the appropriate authorities—primarily the language and the history of the MDA and the regulations under it. The court concludes that defendants' summary judgment motion based on preemption must be denied, but that plaintiff does not have standing to assert the alleged violations of federal law.

### III.

Under the MDA, the Food and Drug Administration (FDA) is required to classify all medical devices into one of three categories. 21 U.S.C. § 360c. Class I devices are generally simple devices, such as tongue depressors and crutches; they pose little or no threat to public health and safety, and gener-

al controls are deemed sufficient to provide reasonable assurance of their safety and effectiveness. 21 U.S.C. § 360c(a)(1)(A)(i). Class II devices are more complex. Those devices may be subject to regulatory recommendations, post-marketing surveillance, patient registries and specific performance standards, if the FDA determines they are sufficiently dangerous products to require specifications and warnings. 21 U.S.C. § 360(a)(1)(B). Class III devices require premarket approval because they present a potential unreasonable risk of illness or injury. 21 U.S.C. § 360c(a)(1)(C)(ii)(II).

The parties agree that these knee joints should be treated as Class II devices. The FDA approved their marketing as being substantially similar to those already in the market, but the FDA did not classify them at the time because the regulations classifying this type of knee device were not yet final.

### IV.

Neither the United States Supreme Court nor the Ninth Circuit has yet considered the preemptive effect of the MDA on tort actions in general, or on Class II devices in particular. Therefore, this court must "ascertain Congress' intent in enacting the federal statute at issue." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983).

The Supreme Court has instructed that federal preemption should be narrowly construed. *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992). A federal statute will supersede state tort remedies only if that is the clear and manifest purpose of Congress. *Id.* at ——, 112 S.Ct. at 2617. The Supreme Court instructs that "we must fairly but—in light of the strong presumption against preemption—narrowly construe the precise language of [the statute] and we must look to each of petitioner's common law claims to determine whether it is preempted." *Id.* at ——, 112 S.Ct. at 2621.

---

**1.** Surgikos is a New Jersey corporation, formerly known as Johnson & Johnson Products, Inc., A New Jersey Corporation.

The specific statute at issue here is 21 U.S.C. § 360k(a), which provides:

> ... no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement ... (1) *which is different from, or in addition to, any requirement applicable under this chapter to the device,* and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter. (emphasis added).

The FDA interprets this preemption as applying to state common law tort claims. Title 21 C.F.R. § 808.1(b) provides:

> ... no State or political subdivision of a State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, *or court decision* ) which is different from, or in addition to, any requirement applicable to such device under any provision of the act.... (emphasis added).

*See also, Stamps v. Collagen Corp.,* 984 F.2d 1416, 1420–21 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993).

However, FDA regulation § 808.1(d) provides that:

> State or local requirements are preempted *only* when the Food and Drug Administration has established *specific counterpart regulations or there are other specific requirements applicable to a particular device under the act,* thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.... (emphasis added).

■ As stated by one district court applying the MDA, defendants claiming preemption:

> must establish that Congress has spoken clearly and made its intention to preempt unmistakable. Alternately, [defendants] must demonstrate that federal law preempts state law to the extent that the state law actually conflicts with or frustrates the purpose of federal law. Thus, if it is possible to comply with both federal and state law, there is neither a conflict nor a frustrated purpose.

*Bravman v. Baxter Healthcare Corp.,* 842 F.Supp. 747, 753 (S.D.N.Y.1994).

### V.

Plaintiff argues that there are no *specific* regulations, as required by 21 C.F.R. § 808.1(d), affecting these devices and therefore none of his claims are preempted. Defendants argue that regulation 808.1(d) is invalid if it compels specific requirements that the statute, § 360k(a), does not. Defendants further argue that even if regulation 808.1(d) applies, plaintiff's claims are preempted because 21 C.F.R. § 888.3560 specifically regulates these devices and several other regulations also apply to them.

### VI.

■ This court first addresses defendants' contention that regulation 808.1(d) is invalid because it is contrary to § 360k(a) of the MDA. As the agency charged with administering this federal act, FDA's regulations are dispositive unless its interpretation is inconsistent with clearly expressed congressional intent. *See Hillsborough County v. Automated Medical Labs Inc.,* 471 U.S. 707, 714–15, 105 S.Ct. 2371, 2375–76, 85 L.Ed.2d 714 (1985). "If the intent of Congress is clear, that is the end of the matter," because FDA must give effect to the unambiguously expressed intent of Congress. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If the statute is ambiguous, the question is whether FDA's interpretation is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2782.

■ Section 360k(a) provides that state "requirements" are preempted if they are different from or in addition to any federal "requirement applicable ... to the device." The term "requirement" is undefined. If § 360k(a) had not included the phrase "applicable ... to the device," it would be clear

that no common law claims could be brought if they were different from or in addition to any of the general requirements of the statute. However, § 360k(a) only preempts state requirements which are different from or in addition to federal requirements *applicable to the device.* That phrase can be read as including all regulations to which the device may be subject, *or* only the regulations which are specifically applicable to that particular device. The FDA has chosen the latter interpretation. Because the language of § 360k(a) is reasonably subject to this construction, it is invalid only if it is contrary to the intent of Congress.

The legislative history of the MDA is not very helpful. Congress promulgated the MDA in order to increase the protection afforded to medical device consumers under then existing law. Congress enacted the statute "to assure that medical devices ... meet the requirements of safety and effectiveness before they are put in widespread use throughout the United States." S.Rep. No. 33, 94th Cong., 2d Sess. at 3 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 1070, 1071. Congress enacted the House version of what became § 360k(a). The House report indicates that the purpose behind § 360k(a) was to limit states from establishing administrative agencies and rules without federal approval. House Rep. No. 853, 94th Cong., 2d Sess. at 45–46 (1976). *See Bravman,* 842 F.Supp. at 755. The Senate had considered a broader provision, which would have preempted states from regulating the "performance, composition, contents, design, finish, construction, packaging, or labeling of [a device]" if the device had undergone a performance standard or scientific review. S.B. 510 § 903, *reported in* 121 Cong.Rec. 10709 (April 17, 1975). But this broader form was not the one enacted by Congress.

The courts that have addressed the Congressional purpose of § 360k(a) have stated

that there is no clear indication of the scope of preemption that Congress intended. *See e.g.: Moore v. Kimberly–Clark Corp.,* 867 F.2d 243, 245 (5th Cir.1989); *Bravman,* 842 F.Supp. at 755 (holding there is no indication that Congress intended to preempt state tort actions). One court which thoroughly addressed this issue, *Larsen v. Pacesetter Sys., Inc.,* 74 Haw. 1, 837 P.2d 1273, 1281 (1992), held that the language of regulation 808.1(d) was consistent with § 360k(a). *See also, Stamps v. Collagen,* 984 F.2d at 1424, n. 8 (concluding that regulation 808.1(d) poses the same test as the statute).

Congress later amended the MDA in 1990 and did not clarify the scope of § 360k(a) preemption, although regulation 808.1(d) existed at that time and several courts had relied upon the regulation to allow tort claims against medical device manufacturers.[2] Congress' failure to clarify § 360k(a) in 1990 indicates that regulation 808.1(d) reflects Congressional intent under § 360k(a). *See Lamontagne v. E.I. Du Pont de Nemours & Co.,* 834 F.Supp. 576, 583 n. 10 (D.Conn.1993); *Larsen,* 837 P.2d at 1281.

This court concludes that regulation 808.1(d) is not invalid, but is a permissible construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

## VII.

Defendants assert that 21 C.F.R. § 888.3560 does specifically regulate these devices within the meaning of regulation 808.1(d). 21 C.F.R. § 888.3560 provides:

(a) *Identification:* A knee joint patello-femorotibial polymer/metal/polymer semi-constrained cemented prosthesis is a device intended to be implanted to replace a knee joint. The device limits translation and rotation in one or more planes via the geometry of its articulating surfaces. It has no linkage across-the-joint. This generic type of device includes prostheses

---

**2.** See *e.g.: Moore v. Kimberly–Clark Corp.,* 867 F.2d at 246 (claims of negligent design and breach of warranty for tampons not preempted); *Rinehart v. International, Playtex, Inc.,* 688 F.Supp. 475, 477–78 (S.D.Ind.1988) (packaging and design defect claims regarding tampons not preempted); *Smith v. Pingree,* 651 F.2d 1021 (5th Cir.1981) (state regulations involving fitting, sale and packaging of hearing aids not preempted); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 N.J. 544, 572, 384 A.2d 795 (1978) (federal preemption of state requirement regarding hearing aids applicable only if conflicts with specific federal counterpart regulations).

that have a femoral component made of alloys, such as cobalt-chromium-molybdenum, and a tibial component or components and a retropatellar resurfacing component made of ultra-high molecular weight polyethylene. This generic type of device is limited to those prostheses intended for use with bone cement (§ 888.3027).

(b) *Classification.* Class II.

Is this identification and classification a "specific" regulation under 21 C.F.R. § 808.1(d)?

Defendants cite *Cameron v. Howmedica, Div. of Pfizer Hosp. Prods. Group, Inc.,* 820 F.Supp. 317 (E.D.Mich.1993) to support their argument that 21 C.F.R. § 888.3560 is a specific regulation which preempts tort claims. In *Cameron,* the plaintiff sued the manufacturer of a Class III artificial hip. The district court concluded that a different, but very similar, regulation to that identifying knee prostheses "plainly discusses the design of hip replacement devices" and therefore preempted plaintiff's tort claim alleging a design defect. 820 F.Supp. at 320. *See also, Lamontagne,* 834 F.Supp. at 583 (D.Conn. 1993) (stating that similar identification regulations would preempt a tort action relating to a component part of a dental device.)

*Cameron* has been questioned by other courts. In *Elbert v. Howmedica Inc.,* 841 F.Supp. 327 (D.C.Haw.1993), the district court discussed the preemptive effect of regulation 888.3560. The defendants in *Elbert* argued that regulation 888.3560 preempted any claims relating to the safety or effectiveness of the device. The *Elbert* court concluded that regulation 888.3560 is intended for identification purposes only, and was not the type of specific requirement which would preempt state tort law. *Id.* at 331–32. *Accord, Parenteau v. Johnson & Johnson Orthopedics Inc.,* 856 F.Supp. 61 (D.N.H.1994) (holding that regulation 888.3560 merely classified the artificial knee device and did not preempt tort claims); *Bravman,* 842 F.Supp. at 757–61 (holding that the identification of a heart valve device did not preempt state tort claims, but the *Class III approval* did preempt the claims); *Michael v. Shiley, Inc.,* No. 93–1729, 1994 WL 59349 *5, 7, 1994 U.S.Dist. Lexis 3980 *16, 21 (E.D.Penn. Feb. 24, 1994) (holding that a regulation which merely identified the device was not a specific regulation, but that the premarket approval requirements and post approval regulations were specific regulations for a *Class III* heart valve); but see *Mendes v. Medtronic,* 18 F.3d 13 (1st Cir.1994).

Several other courts have implicitly held that identification regulations are not sufficient to preempt tort claims. Tampons are specifically identified as Class II devices. *See* 21 C.F.R. §§ 884.5460 and 884.5470. And the FDA has promulgated a regulation specifying the toxic shock warning that all tampons must include. 21 C.F.R. § 801.430. The courts addressing tort claims against tampon manufacturers have held that only the claims relating to warnings are preempted, while other claims are not. *See e.g. Moore,* 867 F.2d at 247; *Krause v. Kimberly–Clark Corp.,* 749 F.Supp. 164, 169 (W.D.Mich.1990); *Bejarano v. International Playtex, Inc.,* 750 F.Supp. 443, 446 (D.Idaho 1990). Two courts have similarly held that claims pertaining to the Class II lead wire components of spinal implants are not preempted. *Brown v. Medtronic, Inc.,* 852 F.Supp. 717, 721 (S.D.Ind.1994); *Murray v. Medtronic, Inc.,* No. 93–1196, (minute entry) 1993 WL 515741, 1993 U.S.Dist. Lexis 17476 (E.D.Lou. Dec. 2, 1993). All of these cases held that the plaintiffs' claims were only preempted to the extent that there were specific regulations other than identification regulations.

This court follows the majority of the above cases, which have not found preemption triggered by similar *identification* regulations. Regulation 888.3560 does not specifically regulate artificial knee devices; it merely identifies them. Therefore it does not preempt plaintiff's claims here.

## VIII.

The court next considers whether the *marketing* approval received by defendants for this device constitutes the type of regulation which preempts plaintiff's claims. The FDA approved the marketing of the Microloc

954

device because it was substantially equivalent to other devices on the market.

The finding of substantial equivalence is different from the pre-marketing approval process for Class III devices. The pre-marketing approval process allows the FDA to approve a Class III device only if it finds that the applicant has made a showing of reasonable assurance that the device is safe and effective, that the methods used in manufacturing, processing and packing conform to requirements, that the proposed labeling is not false or misleading in any particular, and that the device conforms to a performance standard in effect. 21 U.S.C. § 360e(d)(2). Two circuits have held that this pre-marketing approval for Class III devices constitutes a specific regulation which preempts tort claims. *King v. Collagen Corp.*, 983 F.2d 1130, 1134–37 (1st Cir. 1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993); *Stamps v. Collagen Corp.*, 984 F.2d at 1422, n. 3 (5th Cir. 1993).

One court has held that a finding of substantial equivalence for a Class III device does not constitute the type of specific regulation which preempts state tort actions. *See Larsen v. Pacesetter Systems Inc.',* 74 Haw. 1, 837 P.2d 1273, 1282 (1992) (regulations governing pre-marketing approval on a substantial equivalence basis set forth general procedural requirements and do not trigger preemption under regulation 808.1(d)). Defendants argue that *Larsen* should not influence this case because it concerned a Class III device. However, the device in *Larsen* underwent a substantial equivalence analysis rather than the more rigorous pre-market approval procedures. A finding of substantial equivalence requires less supervision by the FDA than a pre-market approval for a

Class III device. *Compare* § 360c(i) and § 360e.

Prior to marketing their Microloc devices, defendants submitted a separate § 510(k)[3] pre-market notification for the patellar, fibial and tibial parts of the device. Title 21 C.F.R. § 807.92 sets forth the content and format of a § 510(k) submission, which must include the basis for a determination of substantial equivalence including a description of the device, a statement of the intended use of the device, and how the technological characteristics compare.[4]

Defendants' submission letters stated that the Microloc products were equivalent to products already on the market. The responsive letters from the FDA stated that the agency determined the devices to be substantially equivalent to ones on the market prior to 1976, but the approval letters did not state whether the device had the same or different technological characteristics. The approval letters stated that defendants could market the devices, provided that they included labeling which prominently stated that the devices are intended for cemented use only, and that the use of the devices should be limited to implantation with low viscosity cement. Plaintiff's implant was used with bone cement, and plaintiff has not alleged that the labelling was deficient with respect to its inclusion of this specific warning. The marketing approval letters also stated that "this letter should not be construed as approval of your device or its labeling." Thus, although the FDA required a warning regarding bone cement, the agency specifically said that the proposed labelling submitted with the marketing request was not approved as to form or content.

It appears clear that the FDA did not approve the design, manufacturing, or other labeling of the device, and no claims pertain-

---

**3.** § 510(k) was codified at 21 U.S.C. § 360(k).

**4.** 21 U.S.C. § 360c(i) provides that in order to determine whether a device is substantially equivalent the FDA must find either that:

(1)(A) ... the device has the same intended use as the predicate device and that the secretary by order has found that the device—
(i) has the same technological characteristics as the predicate device, or

(ii)(I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and efficacy than the predicate device. see also 21 C.F.R. § 807.100(b).

ing to those aspects could be preempted by the substantial equivalence type of approval. The regulations provide that a determination that the device is substantially equivalent to a device already in distribution "does not in any way denote official approval of the device." 21 C.F.R. § 807.97.

One court has recently held that a finding of substantial equivalence should be considered a specific requirement preempting tort claims, even though the FDA's marketing approval letter stated that it "did not denote official FDA approval of [the prosthesis] or its labeling." *English v. Mentor Corp.*, No. 93–2725, 1994 WL 263353 *5, 1994 U.S.Dist. Lexis 7941, at *14 (E.D.Penn, June 14, 1994). In *English*, the court considered a Class III device, which had undergone a nine month clinical evaluation conduced pursuant to an FDA-approved investigational device exemption. The court determined that the substantial equivalence procedure was similar to the premarket approval process for Class III devices and was therefore a requirement which would preempt tort claims. *Id.* at *8, 1991 U.S.Dist. Lexis 7941, at *24. The premarket submission in *English* included clinical and biological testing data, physical and mechanical testing, manufacturing and quality procedures, and sterilization procedures. The premarket submission for the Microloc device components included no biological testing data, but only the results of laboratory testing of the tensile strength, shear strength and fatigue strength of some specimens. The Microloc substantial equivalence submission can therefore be distinguished from *English*, because defendants here did not give sufficient data for the FDA to make a determination regarding the safety of the Microloc device.

As stated, the FDA regulations specify that a finding of equivalence does not denote the approval of a device. 21 C.F.R. § 807.97. The FDA repeated this in its premarket approval letters to defendants. Premarket approval in this case is not a specific regulation of the device which preempts tort claims.

## IX.

■ Defendants argue that plaintiff's tort claims would in effect impose different and additional requirements than those with which the Microloc device must already comply. Defendants refer to the reporting requirements, pre-marketing requirements, manufacturing controls, classification procedures and component descriptions contained in other regulations. The regulations which defendants cite are general controls.[5] (*See,* § 360c(h)(1), definition of general controls).

However, a Class II device is, by statutory definition "[a] device which cannot be classified as a Class I device because *the general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device ....*" 21 U.S.C. § 360c(a)(1)(B) (emphasis added).

Instead, the regulatory history of 21 C.F.R. § 888.3560 shows that the FDA intended to promulgate *specific performance standards*[6] to regulate Class II devices. When regulation 888.3560 was proposed, the Orthopedic Device Classification Panel recommended that establishing a performance standard should be a high priority, because the "design, material composition, and mechanical properties of the device, such as its flexibility, rigidity, strength, and surface finish should be controlled to prevent loss or reduction of joint function, adverse tissue reaction, or infection." 47 Fed.Reg. 29052, 29101 (proposed July 2, 1982). The FDA agreed with the panel's recommendation. *Id.* at 29102. After notice and comment, the FDA published its final regulation and stated its conclusion that "performance standards are necessary to provide reasonable assurance of the safety and effectiveness of the

---

**5.** Defendants cite some regulations which are not general controls but which are discretionary, but do not argue that the FDA has applied them to the Microloc device. *See* 21 U.S.C. § 360d (performance standards); 21 U.S.C. § 360f (power to ban); 21 U.S.C. § 360*l* (postmarket surveillance).

**6.** Performance standards must address such factors as the devices' design, construction, components, manufacturing process and quality control, testing of the device, labeling requirements, and warnings, where necessary to provide reasonable assurance of the device's safe and effective performance. 21 C.F.R. § 861.7; 21 U.S.C. § 360d(2).

device ... FDA believes that a performance standard is necessary to control the design, material composition, and mechanical properties of the device such as its flexibility rigidity, strength and surface finish." (52 C.F.R. 33697 (1987) (to be codified at 21 C.F.R. § 888.3560).

No such performance standards have yet been promulgated. However, the FDA has stated that performance standards will be necessary to control the design, material, composition and mechanical properties of the device. It is therefore clear that the FDA did not provide that the general controls under the statute and regulations would be sufficient to regulate the design of this type of device. Because the FDA has not yet developed such specific performance standards, plaintiff's causes of action regarding those factors are not preempted.

Defendants argue that "Congress has determined that the safety and effectiveness of medical devices can best be promoted through the development of uniform standards under the expertise of the FDA. To this end, Congress has decided that state law claims which would give rise to contrary requirements should be preempted." Defendants are correct. But the FDA has not yet promulgated the standards to regulate the safety and effectiveness of this type of device.

The First Circuit has recently held that general regulations such as those cited by defendants can preempt state tort claims, because they impose additional requirements. *Mendes v. Medtronic, Inc.*, 18 F.3d 13 (1st Cir.1994). *See also, Gile v. Optical Radiation Corp.*, 22 F.3d 540 (3rd Cir.1994) (holding tort claims against investigational device preempted). The *Mendes* case concerned a Class III pacemaker which was approved as being substantially equivalent to a product on the market which had undergone premarket approval. The *Mendes* holding, in its broadest interpretation, calls into question *all* of the cases which have allowed some tort claims to survive preemption. Although it is very recent, *Mendes* has already been questioned. *Oja v. Howmedica, Inc.*, 848 F.Supp. 905, 907 (D.Colo.1994).

This court also declines to follow *Mendes* to the extent that its reasoning could apply to these Class II devices, and finds that the general provisions cited by defendants do not preempt plaintiff's tort claims. Holding otherwise would compel preemption even though the FDA has specifically stated that it will promulgate performance standards to control the design, material composition and mechanical properties of the device (52 Fed. Reg. 33697). The FDA did not intend that its general regulations would be the maximum requirements applicable to the Microloc device.

## X.

■ Finally, this court considers whether plaintiff has standing to allege claims for the alleged failure of the Microloc device to conform to FDA standards. Plaintiff asserts in this motion that his claims include those allegations. Defendants argue that there is no private right of action for such a claim. The courts appear to be split on this issue.

In *Reiter v. Zimmer Inc.*, 830 F.Supp. 199, 204 (S.D.N.Y.1993), the district court held that state tort claims with regard to Class III bone cement were preempted, but held that the plaintiff's claims that the product failed to comply with FDA manufacturing standards could proceed. In *Stewart v. International Playtex, Inc.*, 672 F.Supp. 907, 909–10 (D.S.C.1987), a district court granted summary judgment against state tort claims for inadequate labelling of tampons, but held that the plaintiff's claims that the product failed to comply with federal regulations survived.

However, other courts that have addressed the issue have held that there is no private cause of action for violation of the Food, Drug, and Cosmetic Act. *See Gile v. Optical Radiation Corp.*, 22 F.3d at 544; *Lewis v. Intermedics Intraocular, Inc.*, No. 93–0007, 1994 WL 149870 *1, 1994 U.S.Dist. Lexis 5158, at *2 (E.D.Lou. Apr. 20, 1994); *Kemp v. Pfizer, Inc.*, 835 F.Supp. 1015, 1022 n. 5 (E.D.Mich.1993); *Brinkman v. Shiley, Inc.*, 732 F.Supp. 33, 35 (M.D.Pa.1989) *Aff'd without op.*, 902 F.2d 1558 (3rd Cir.1989); and *Pacific Trading Co. v. Wilson & Co., Inc.*, 547 F.2d 367, 370 (7th Cir.1976).

The Food, Drug, and Cosmetic Act provides that "all such proceedings for the enforcement, or to restrain violations, of [the Act] shall be by and in the name of the United States." 21 U.S.C. § 337(a). The Act also allows states to bring certain limited causes of action. Given that language and the regulatory nature of the Act, and the fact that Congress has vested the power to enforce the regulatory scheme in the United States, this court concludes that there is no private right of action. *See Pacific Trading,* 547 F.2d at 370. Therefore, to the extent that plaintiff alleges causes of action that defendants failed to comply with the Act or the regulations, summary judgment should be granted in favor of defendants.

### XI.

For the reasons set forth above:

(1) Defendants' motion for summary judgment on the ground of preemption is denied.

(2) Defendants' motion for summary judgment on the ground of no standing by plaintiff to bring a cause of action to enforce the Food, Drug, and Cosmetic Act is granted.

(3) The pretrial conference will be on November 3, 1994 at 3:00 o'clock p.m.

(4) The trial will be on November 28, 1994.

IT IS SO ORDERED.