**Brunilda MARTINEZ CARABALLO, et al., Plaintiffs,**

v.

**INTERMEDICS, INC., et al., Defendants.**

**Civ. No. 93–1749(JP).**

United States District Court, D. Puerto Rico.

May 25, 1995.

Efrén Irizarry, Arecibo, P.R., Elisa Figueroa, San Juan, P.R., for plaintiff.

José Delgado Cadilla, San Juan, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

Plaintiffs, Brunilda Martínez Caraballo and her husband, brought this diversity products liability action against the manufacturers of the Quantum pacemaker and their insurers, alleging negligence in design, manufacture, distribution and sale of the pacemaker, failure to warn, breach of implied warranty of merchantability, failure to comply with governmental regulations, fraud, and intentional misconduct.

Before the Court is defendants' motion for summary judgment alleging that plaintiffs' claims are preempted by the Medical Devices Amendment to the Federal Food, Drug and Cosmetic Act, plaintiffs' opposition, and their respective supplemental motions (docket Nos. 27, 32, 44, 48, 49 and 50). For the following reasons, defendants' motion is hereby **GRANTED.**

## I. UNDISPUTED FACTS

The Quantum implantable pulse generator, Intermedics Model No. 253–19, series number 65977, is designed for a variety of permanent cardiac pacing applications in the treatment of conduction or impulse formation disorder. Plaintiff was implanted with this model on January 3, 1987, in order to control her condition of atrioventricular ("AV") block. During the next five years, plaintiff's checkups showed that her implanted pacemaker functioned normally.

On March 6, 1991, Intermedics sent out a "Safety Alert" letter to all physicians who had implanted Intermedics pacemakers in their patients. In this letter, Intermedics warned that a defect had been discovered in a batch of pacemaker batteries which increased the risk of battery malfunction in the pacemakers. Furthermore, Intermedics suggested that physicians should consult with their patients about the possibility of a malfunction and whether the patients should replace their pacemakers. During February or

March 1992, plaintiff's cardiologist discussed with her the Intermedics letter and the possibility that her pacemaker would malfunction. Nevertheless, plaintiff did not replace her pacemaker.

At a regularly scheduled checkup on June 3, 1992, plaintiff's cardiologist checked her pacemaker and found no problems. A few weeks later, on June 29, 1992, around 7:30 p.m., plaintiff experienced convulsions and lost consciousness in her home. She was admitted to the emergency room and diagnosed with a non-capturing pacemaker because the battery in her pacemaker had stopped working. The malfunction in the power source resulted in the low module voltage, causing her pulse rate to drop to forty beats per minute. The next day, the malfunctioning pacemaker was replaced with a new Intermedics pacemaker. For purposes of this motion for summary judgment, defendants stipulate that the power source malfunction was the proximate cause of plaintiff's injuries.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment in a case where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993); *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988).

Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987); *Peckham v. Ronrico Corp.*, 171 F.2d 653 (1st Cir.1948). A "genuine" issue is one that is dispositive, and which consequently must be decided at trial. *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A material fact, which is defined by the substantive law, is one which affects the outcome of the suit and which must be resolved before attending to related legal issues. *Mack*, 871 F.2d at 181.

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the nonmovant to provide the Court, through the filing of supporting affidavits or otherwise, with "some indication that he can produce the quantum of evidence [necessary] to enable him to reach the jury with his claim." *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975); *see also Brennan*, 888 F.2d at 191. The non-movant cannot rest upon mere allegations or denial of the pleadings. Fed.R.Civ.P. 56(e). Indeed, the non-movant must affirmatively show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

## III. MEDICAL DEVICE AMENDMENTS TO THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

The Medical Device Amendments ("MDA") to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360, *et seq.*, regulate the marketing of medical devices to consumers. This statute "reflects Congress' balancing the need for regulation to protect public health against its interest in allowing new and improved devices to be marketed expeditiously without the costs attributable to an excess of regulation." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 14 (1st Cir.1994). Through the MDA, Congress developed a three-tiered classification system of medical devices. 21 U.S.C. § 360c(a). Under this system, all medical devices are categorized as either Class I, Class II, or Class III device, depending upon the risk that each device presents to human health and safety. The Quantum

implantable pulse generator, or pacemaker, is categorized as a Class III device, one which poses the greatest risk to human health and safety. 21 CFR § 870.3610 and 21 CFR § 870.3680.

In general, manufacturers of Class III devices must obtain approval from the Federal Drug Administration ("FDA") prior to marketing those devices. 21 U.S.C. § 360c(a)(1)(C); 21 U.S.C. § 360e. The premarket approval ("PMA") regulations require a manufacturer of a Class III device to submit an application to the FDA containing information about how the medical device will be used, to whom it will be sold, how it will be manufactured, and how it will be labeled. 21 U.S.C. § 360c(a)(2). Based upon that information, the FDA decides whether there is "reasonable assurance of its safety and effectiveness." 21 U.S.C. § 360c(a)(1)(C); 21 C.F.R. § 860.7. If the FDA is convinced that the device is both safe and effective, it permits the manufacturer to market the device.

Although premarket approval is generally required for marketing a Class III device, certain categories of Class III medical devices are exempted from the strict requirements of compliance with the PMA. For instance, Class III devices which are used for investigational uses and humanitarian purposes, 21 U.S.C. § 360j(g) and § 360j(m), respectively, may be marketed to consumers absent premarket approval. In addition, a Class III device which is "substantially equivalent" to a medical device which was already on the market on May 28, 1976, when the MDA was enacted, may be marketed without complying with the PMA. 21 U.S.C. § 360e(b)(1); 360j(1). A substantially equivalent medical device is defined in 21 U.S.C. § 360c(i)(1)(A), as one which:

(i) has the same technological characteristics as the predicate device, or

(ii)(I) has different technological characteristics and the information submitted that the device is **substantially equivalent** to the predicate device contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that

the device is as safe and effective as a legally marketed device, and

(II) does not raise different questions of safety and efficacy than the predicate device. (Emphasis added).

Although manufacturers of substantially equivalent devices need not comply with the premarket approval (PMA) procedures prior to selling the devices to consumers, the following regulations govern how these devices are marketed. Ninety days before the manufacturer intends to introduce the device into interstate commerce for commercial distribution, the manufacturer must submit a premarket notification ("a 510(k) Notification") to the FDA. 21 C.F.R. § 807.81. This 510(k) Notification must contain "an adequate summary of any information respecting [the] safety and effectiveness [of the device] ..." 21 U.S.C. § 360c(i)(3)(A), including the potential adverse health effects, or risks, entailed by use of the device. Id. § 360c(i)(3)(B). Unlike approval pursuant to the PMA, a finding of substantial equivalence "does not in any way denote official approval of the device." 21 C.F.R. § 807.97. On May 16, 1984, the FDA approved the marketing of the Quantum implantable pulse generator, Intermedics Model No. 253–19, series number 65977, upon a finding of substantial equivalence.

## IV. PREEMPTION

### A. INTRODUCTION

The Supremacy Clause of the Constitution invalidates state laws that "interfere with, or are contrary to" federal law. U.S.CONST. art. VI, cl. 2. The Medical Device Amendments (MDA) contain an express preemption clause, stating in pertinent part:

No state may establish or continue in effect, ..., any requirement

(1) which is different from, or in addition to, any requirement applicable under the Act, and

(2) which relates to the safety or effectiveness or to any other matter included in any requirement of the Act. 21 U.S.C. § 360k.

Congress specifically included the preemption clause in the MDA in order to preclude

state requirements which interfere with the manufacturers' distribution and the consumers' access to the medical devices in interstate commerce. *Mendes,* 18 F.3d at 16 (citations omitted). States[1] can interfere with interstate commerce through various requirements, "including statutes, regulations, court decisions or ordinances." 21 C.F.R. § 808.1(b); *King v. Collagen Corp.,* 983 F.2d 1130, 1134 (1st Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993). Judicial opinions also constitute "state requirements" since a finding that a manufacturer was liable defines consumers' rights and manufacturers' duties. Therefore, the preemption clause bars individuals from prosecuting "certain common law claims because such claims may establish state "requirements" (citations omitted). *Mendes,* 18 F.3d at 16.

## B. *MENDES V. MEDTRONIC, INC.*

The First Circuit has recently established the parameters of the MDA preemption clause as it applies to common law product liability claims against manufacturers of pacemakers, *Mendes v. Medtronic,* 18 F.3d 13 (1st Cir.1994). The facts in the *Mendes* case are strikingly similar to those in the case at bar. The manufacturer of the pacemaker model, similar to the quantum model, received permission from the FDA to market the Class III device under the substantial equivalence exception to the premarket approval process. Plaintiff's pacemaker malfunctioned and she nearly died. In a surgical operation, the pacemaker was removed and a new model was implanted, *Id.* at 15. Plaintiff thereafter sued the manufacturer of the pacemaker, alleging negligent manufacture and distribution, failure to warn, and breach of implied warranty of merchantability.

The First Circuit adopted the following analytic framework in interpreting the application of the MDA express preemption clause to a plaintiff's state tort claims. First, the Court must analyze what requirements are established by the MDA for each medical device. Next, the Court must determine whether successful litigation of plaintiff's tort claims would impose any requirements under common law different from, or in addition to the MDA imposed requirements. *Id.* at 16–17. Following this analysis, successful litigation of plaintiff's negligence and implied warranty claims based upon the manufacturer's duty to warn would impose additional requirements upon manufacturers beyond the requirements of "good manufacturing practices" mandated by the FDCA and MDA. *Id.* at 18. These manufacturers would either be required to change their FDA approved labels to include the additional information requested by plaintiff, or risk exposure to civil liability. Similarly, successful litigation of plaintiff's negligent manufacture claim would require manufacturers to comply with manufacturing procedures separate and distinct from those required by the FDA as "good manufacturing practices," *Id.* at 19, or risk exposure to liability. Consequently, plaintiff's allegations of negligent manufacture and distribution, failure to warn, and breach of implied warranty of merchantability were all preempted by the MDA.[2]

■ Applying the *Mendes* precedent to the case at bar, plaintiffs are precluded from litigating their claims of negligent manufacture, distribution and sale of the pacemaker,

---

1. For purposes of federal preemption analysis, Puerto Rico is considered a state. *Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 500, 108 S.Ct. 1350, 1353, 99 L.Ed.2d 582 (1988) (citations omitted).

2. Since plaintiff in *Mendes* argued that it was her particular pacemaker, not the whole line of pacemakers, that was negligently manufactured, the First Circuit did not decide whether a claim of negligent manufacture claim is preempted. *Id.* at 17. Nevertheless, a plaintiff's claim of negligent design must be likewise preempted. "Otherwise, a finding of negligence would force [the manufacturer] to alter these aspects of [the de-

vice] in response to a finding of liability, or be subject to liability." *King,* 983 F.2d at 1136 (preempting defective design claim of implantable anti-wrinkle product). *See also English v. Mentor Corp.,* 1994 WL 263353, (E.D.Pa.1994) (preempting defective design claims of penile prosthesis); *Cameron v. Howmedica, Div. of Pfizer Hosp. Prods. Group, Inc.,* 820 F.Supp. 317 (E.D.Mich.1993) (prosthetic hip replacement); *Stamps v. Collagen Corp.,* 984 F.2d 1416 (5th Cir.) *cert. denied* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993) (Class III antiwrinkle treatment product); *Guzman v. Intermedics,* 1994 WL 792590, 1994 U.S.Dist. LEXIS 17642 (E.D.Mich. 1994) (heart pacemaker).

implied warranty for merchantability, and failure to warn by the express preemption clause in the MDA, 21 U.S.C. § 360k. Thus this Court will only analyze the following claims which are not specifically preempted and precluded by *Mendes*: noncompliance with FDA regulations, fraud, and intentional misconduct.

## V. FAILURE TO COMPLY WITH FDA REGULATIONS IN OBTAINING APPROVAL

Plaintiffs allege that defendants failed to comply with the regulations for Investigational Device Exemption for Clinical Testing and for Premarket Notifications 510(k) under the pre-market approval application, Amended Complaint ¶ 23. They assert that defendant's 510(k) notification fails to demonstrate that the new Intermedics pacemaker model was as safe and effective as the model previously on the market.

■ As an initial observation, plaintiff does not have standing to enforce FDA regulations. The Food, Drug and Cosmetic Act provides that "[a]ll such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337. Most courts which have confronted this issue have held that the FDA is responsible for enforcing its own regulations, and that there is no private cause of action to enforce these federal regulations. *See Ginochio v. Surgikos, Inc.*, 864 F.Supp. 948 (N.D.Calif.1994); *Strong v. Telectronics Pacing Systems Inc.*, 1994 LEXIS 15067 (N.D.Mich.1994); *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 544 (3rd Cir.1994); *Kemp v. Pfizer, Inc.*, 835 F.Supp. 1015, 1022 n. 5 (E.D.Mich.1993). *But see Reiter v. Zimmer, Inc.*, 830 F.Supp. 199 (S.D.N.Y.1993) (permitting plaintiffs to pursue discovery as to whether manufacturer of Class III bone cement complied with FDA regulations).

■ Even if plaintiffs did have standing, they have failed to produce any evidence that Intermedics failed to comply with the relevant FDA regulations. Defendant has submitted a sworn affidavit by Richard Stevenson, Vice President of Regulatory Affairs for Intermedics, Inc. In the affidavit, Mr. Ste-

venson states that he has been responsible for preparing submissions to the U.S. Food and Drug Administration for clinical testing and marketing clearance of the company's products, including the pacemaker at question in the case at bar. He further states that the information submitted to the FDA for the 510(k) notification to receive a finding of substantial equivalence was truthful and accurate. *See* docket No. 44, Exhibits A and B. Through this affidavit, defendants met their burden of showing that there is no evidence to support plaintiffs' claims. Mr. Stevenson's affidavit shifted the burden to plaintiffs to produce some evidence either in affidavits, depositions, or answers to interrogatories that would suggest that defendants have not in fact complied with FDA regulations. Plaintiffs have failed to meet their burden of proof.

■ Moreover, plaintiffs' allegations are based upon a misunderstanding of the underlying statute and federal regulations. Plaintiffs charge in essence, that Intermedics failed to comply with the strict requirements of the premarket approval procedures. The Intermedics quantum model pacemaker, however, received FDA permission to market pursuant to a finding of substantial equivalence. "Devices found to be 'substantially equivalent' are entitled to bypass the premarket approval process unless or until FDA issues a regulation specifying that the device undergo the review process." *Mendes*, 18 F.3d at 15. The FDA had not issued regulations requiring pacemakers to undergo the PMA. Therefore, Intermedics was not obligated to comply with the requirements of the premarket approval process.

## VI. FRAUD

Plaintiffs alternatively allege that even if defendants complied with FDA regulations, they obtained FDA permission to market the Quantum pacemaker through fraudulent means. There is a disagreement among several courts as to whether allegations of fraud constitute an exception to the blanket preemption of state product liability claims against manufacturers. *See Michael v. Shiley, Inc.*, 1995 U.S.App. LEXIS 2249 (3rd

Cir.1994) (allowing plaintiff's claims of fraud based on false advertisements and promotion). *But see Talbott v. C.R. Bard, Inc.*, 865 F.Supp. 37 (D.Mass.1994) (preempting the fraud claim, reasoning that if Congress had intended for a fraud exception to exist, it would have explicitly included one in the statute); *Kemp v. Pfizer, Inc.*, 835 F.Supp. 1015, 1021 (E.D.Mich.1993) (PMA). *King v. Collagen Corp.*, 983 F.2d 1130, 1134 (1st Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52, 126 L.Ed.2d 52 (1993) (preempting claim that defendant manufacturer fraudulently obtained PMA of device).

■ In the case at bar, plaintiffs have failed to allege any facts or to adduce any evidence to support their claim of fraud. Therefore, it is not necessary to decide whether a fraud exception to the blanket preemption of consumers claims against manufacturers exists. Plaintiffs' first fraud allegation claims in a conclusory fashion that the documents defendants submitted as exhibits to its 510(k) notification to the FDA are fraudulent. As previously discussed, defendants have produced an affidavit from Mr. Stevenson stating that the information submitted to the FDA was truthful and accurate. Plaintiffs have failed to adduce any evidence which would contradict Mr. Stevenson's affidavit or otherwise demonstrate that the documents were in fact fraudulent.[3] Furthermore, plaintiffs fail to allege what particular statement of the submitted document is false, why the statement is false, what individual was responsible for compiling the document, and if that individual or any one else knew that the alleged statements were false. Therefore, plaintiffs have failed to generate a genuine question of material fact as to whether defendants committed fraud when submitting their documents to the FDA.

Plaintiffs next allege that defendants breached their general duty not to deceive by publishing an advertisement containing false information. The portion of the advertisement emphasized by plaintiffs reads as follows:

> Along with reduction in size, the longevity of pacemakers has been dramatically increased. Your pacemaker's power source is a long-life battery that is hermetically sealed, along with the circuitry, inside the pulse generator. You can expect your pacemaker to operate reliably for many years. *See* docket No. 35, First Amended Complaint, p. 7.

Plaintiffs have failed to adduce any evidence which would support their contention that this advertisement was based on false information. Plaintiffs have not alleged that defendants knew, before running the advertisement, that the battery would malfunction and prevent the pacemaker for operating reliably for years. Such bald allegations which are not pled with specific factual particularity are insufficient to sustain an allegation of fraud.

## VII. INTENTIONAL MISCONDUCT

■ Plaintiffs' final allegation states that defendant "acted with malice, moral turpitude, willfulness, and/or reckless indifference". Plaintiffs fail to aver any factual predicate for these serious allegations against defendant corporation. The uncontested facts not only fail to support plaintiff's allegations, but moreover, they tend to prove that Intermedics did not act intentionally to harm plaintiff. When Intermedics learned of the possible defect in a batch of pacemaker batteries, it sent physicians a safety alert letter warning of the possible dangers. Plaintiff's physician did in fact inform her of Intermedics letter, and warn her of the perceived danger of failing to replace the battery. Nonetheless, plaintiff and her physician did not replace the battery in her pacemaker. Nothing in those facts supports plaintiffs' allegations of Intermedics' malice,

---

**3.** Plaintiffs allege that they have been unable to generate any evidence of fraud because defendants have failed to provide legible copies of the documents submitted to the FDA. Without a legible copy of these documents, plaintiffs argue, they are unable to compare the documents filed with the FDA and the documents in defendants' records. *See* docket No. 49. Defendants respond that the documents plaintiffs have requested are stored on microfiche, and that the copies sent to plaintiffs were the most legible copies possible. Furthermore, defendants had offered plaintiffs the opportunity to personally review the records on microfiche at their convenience. *See* docket No. 50. Plaintiffs failed to avail themselves of defendants' offer, or to otherwise seek discovery of the information.

moral turpitude, willfulness, and/or reckless indifference.

## VIII. CONCLUSION

For the foregoing reasons, plaintiff's claims of negligent manufacture, distribution and sale of the pacemaker; implied warranty for merchantability; and failure to warn are preempted by the Medical Devices Amendment to the Federal Food, Drug, and Cosmetic Act. Further, plaintiffs have failed to produce any evidence to support their allegations of failure to comply with FDA regulations, fraud and intentional misconduct. Therefore, defendant's motion for summary judgment is hereby **GRANTED.**

IT IS SO ORDERED.